IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LESTER PUERNER,

                 Plaintiff

v.

DAWN ATKINSON,

                 Defendant.

OPINION and ORDER

14-cv-781-slc

---

Plaintiff Lester Puerner is proceeding *pro se* on a claim that defendant Dawn Atkinson violated his rights under the Eighth Amendment and state law by denying him adequate compression supports to treat blood clots in his legs. Atkinson has moved for summary judgment. Dkt. 73. Because the evidence shows that Atkinson did not violate Puerner's rights, I am granting summary judgment in her favor.

UNDISPUTED FACTS[1]

A.    **The Parties**

Plaintiff Lester Puerner was incarcerated at the Oshkosh Correctional Institution (OCI) at all times relevant to this case. Puerner has been diagnosed with peripheral vascular disease with a long history of varicose veins, and as a result has worn compression support stockings for many years.

Defendant Dawn Atkinson is an advanced nurse practitioner, with certification as a family nurse practitioner and geriatrics nurse practitioner. Atkinson has worked at various prisons in Wisconsin pursuant to a contract with Registry of Physician Specialists, a California corporation. In 2014, Atkinson provided medical services at OCI. While there, she provided medical care to Puerner from approximately February 17 to August 28, 2014.

---

[1] The following facts are material and undisputed unless otherwise noted. The facts are drawn from the parties' proposed findings of fact and responses.

**B.      Atkinson's Medical Treatment of Puerner**[2]

Puerner's first appointment with Atkinson was on February 17, 2014. At that appointment, Puerner told Atkinson that he needed new TEDS support stockings that provided 30-40 mmHg support, rather than 20-30 mmHg.[3] (Puerner had received 20-30 mmHg stockings in September 2013 from his then-treating physician, Mary Sauvey, M.D.) Atkinson examined Puerner, noted that his current stockings were loose, and wrote an order for "New TEDS – 30-40 mm – 2 pairs." That same day, the nurse responsible for fulfilling the order returned it to Atkinson for clarification, noting that "[w]e don't have 30-40 mm TEDS, we have small, med, large, XL, XXL, both knee high and thigh high lengths. If the 30-40 mm is length, he will need Regular or Long." Atkinson issued a new prescriber order on February 18, 2014, stating, "make TEDS waist high and regular compression."

After Puerner received the new stockings, however, he realized he had inadvertently asked Atkinson for the wrong brand. He told health services unit staff that he actually needed JOBST stockings, not TEDS stockings, as the TEDS brand stockings were ineffective for him. Atkinson subsequently discontinued the TEDS order and directed a nurse to measure Puerner for JOBST stockings. On March 3, 2014, Puerner was measured for new JOBST stockings, and on March 10, new JOBST stockings were ordered.

---

[2] In addition to treating Puerner for his varicose veins and vascular disease, Atkinson treated Puerner for many other medical issues, including joint pain, arthritis, chronic lymphocytic leukemia, hernia among others. Puerner makes no claims in this case regarding the treatment he received for his other health conditions.

[3] "mmHg" stand for millimeter of mercury, a unit of measure for pressure. 52 mmHg equals about 1 psi (pounds per square inch).

2

At some point in March 2014, Atkinson was told that JOBST stockings at 30-40 mmHg were no longer available through DOC's current supplier. Also, in reviewing Puerner's records, Atkinson learned that on one or two occasions he had cut off his JOBST stockings, or parts of them, due to pain from tightness. On March 27, 2014, Atkinson entered a new prescriber order:

> 3/27/14 Jobst stocking 20-30 mm Hg to PT indefinitely ~~until 30-40 mm MG Jobst stockings available.~~ (Cut off 30-40 in past) Verbal order D. Atkinson APNP/____ D. Atkinson, APNP.

On March 31, 2014, Atkinson wrote a prescriber order stating:

> Patient to be updated. Will get 20-30 mmHg leg supports as cut off 30-40 in past R/T [related to] tightness.

On April 2, 2014, Puerner was offered the new 20-30 mmHg JOBST stockings. He refused them, however, stating he would only wear 30-40 mmHg. He also explained that he had not cut off the previous 30-40 mmHg stockings because they were too tight, but rather because they were worn out. The nurse notified Atkinson of his refusal.

Atkinson consulted with the manager of the health services unit regarding Puerner's request for 30-40mmHg stockings. The HSU manager recommended that Puerner be prescribed the 20-30 mmHg supports because that was what the supplier offered, unless Atkinson thought a higher compression was medically necessary. Atkinson did not, so on April 3, Atkinson issued the following order:

> I will not address JOBST stocking issues anymore. Patient is getting what we supply and he will wear without altering.

Puerner met with Atkinson again on April 16, 2014 regarding his stockings. Puerner told Atkinson he wanted 30-40 mmHg JOBST stockings as recommended to him by the Veteran's Administration for deep venous thrombosis, and also that he needed two new pairs every four

3

months. Atkinson responded that she would provide new stockings when his current pairs were worn out and that she would order 30-40 mmHg if he could produce an order showing that he needed them. She also discussed what deep venous thrombosis is, how it develops, and how to prevent it. At this point, Atkinson did not believe Puerner had ever been diagnosed with deep venous thrombosis; nor did Puerner show any symptoms of having deep venous thrombosis. However, Atkinson ordered nursing staff to check Puerner's feet at night to see if there was edema or swelling to the feet or signs of other problems indicative of deep venous thrombosis. The nurses performed these checks; they did not find any of these symptoms.

On May 23 and 28, 2014, Puerner again complained to nursing staff about his support stockings. At some point, Puerner provided Atkinson with a note from a physical therapist recommending JOBST stockings of 30-40 mmHg. On May 29, 2014, Atkinson spoke with Dr. Patrick Murphy about Puerner. Dr. Murphy was a family practice physician who had treated Puerner previously at OCI. After talking with Murphy, Atkinson called a meeting for June 5, 2014 with Dr. Murphy and Puerner. At this meeting, Atkinson and Murphy concluded that Puerner should continue using waist-high compression stockings at 20-30 mmHg, with checks every 6 months for a new pair. Both Aktinson and Murphy believed that the 20-30 mmHg JOBST stockings were appropriate for Puerner's condition of peripheral vascular disease and varicose veins. Atkinson again told Puerner that she would consider changing her order if Puerner supplied a physician's order for 30-40 mmHg due to a diagnosis of deep venous thrombosis, but that the note from the physical therapist was not sufficient. Atkinson also declined to refer Puerner to a vascular specialist so he could be assessed for deep venous thrombosis.

Atkinson stopped providing care at OCI in August 2014. Puerner did not develop deep venous thrombosis during Atkinson's tenure at OCI; nor did he ever have any incidents stemming from deep venous thrombosis such as pulmonary embolism, stroke, or other conditions that could result from deep venous thrombosis.

C.      Veteran's Administration Records

Puerner maintains that he was diagnosed with deep venous thrombosis at some point while he was being treated by the VA. However, Atkinson's counsel obtained Puerner's medical records from the VA going back to 1998, and none of the records indicate that he was ever diagnosed deep venous thrombosis. Records from 1998 and 1999 indicate that Puerner had been diagnosed as having varicose veins in both his legs and chronic venous insufficiency, also known as peripheral vascular disease. In December 1998, the VA referred Puerner to a vascular specialist, who ordered that Puerner be provided with medium compression thigh-high JOBST stockings for his varicose veins. In April 1999, a physician in the VA Hospital's Peripheral Vascular Surgery Clinic again diagnosed varicose veins and ordered a consultation with physical therapy/occupational therapy so that he could again be provided with compression stockings. The physician's order stated that Puerner should be provided "graded compression stockings measure for 20-30 mmHg or 30-40 mmHg<prefer." The instruction to physical therapy stated

> PLEASE FIT PATIENT WITH KNEE HIGH 20-30 MMHG or 30-40 MMHG-PREFERRED.

The VA records provide no information to whether the physician or Puerner was the source of the "prefer 30-40 mmHg." A May 17, 1999, physical therapist's note indicates that Puerner was fitted for SigVaris pantyhose, closed-toe style compression hose, 30-40 mmHg.

5

OPINION

The states have an affirmative duty under the Eighth Amendment to provide medical care to their inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To succeed on his claim that Atkinson violated his right to medical care under the Eighth Amendment, Puerner must show (1) an objectively serious medical condition to which (2) Atkinson was "deliberately indifferent." *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). "Deliberate indifference" means that Atkinson was aware that Puerner needed medical treatment, but disregarded an excessive risk to his health by consciously failing to take reasonable measures to address it. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)*; Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

On the question whether Puerner had a serious medical need, the evidence shows that Puerner has been diagnosed with varicose veins and peripheral vascular disease. Puerner, who has the burden of proving that he had a serious medical condition, did not provide evidence about the seriousness of his conditions or any symptoms that he suffered from them. For her part, Atkinson states in her declaration that Puerner's varicose veins and peripheral vascular disease are not "serious medical conditions," Atkinson Dec., dkt. 75, ¶ 62, but she provides no explanation for this opinion.

For the purposes of summary judgment, I will assume that Puerner's varicose veins and vascular disease were serious medical conditions. Certainly, in some cases varicose veins may be solely a cosmetic concern, but in other cases they may cause extreme pain and may lead to more serious health problems.[4] Likewise, chronic venous insufficiency may present only mild

---

[4] http://www.mayoclinic.org/diseases-conditions/varicose-veins/home/ovc-20178078.

symptoms, but also can cause pain, swelling and severe complications.[5] Moreover, it is undisputed that medical professionals have prescribed compression stockings as treatment for Puerner's conditions for many years. *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007) ("A medical condition is deemed to be objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment. . . .'.") (citation omitted).

But Puerner's claim falters on the second prong of the Eighth Amendment analysis because he has not submitted evidence from which a jury could find that Atkinson was deliberately indifferent to his medical needs. To show a genuine issue of material fact on the deliberate indifference prong, Puerner needed to submit evidence suggesting that Atkinson's treatment decisions were "blatantly inappropriate," *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014), clearly "ineffective," *Smego v. Mitchell*, 723 F.3d 752, 758 (7th Cir. 2013) or "so far afield of accepted professional standards as to raise the inference that [they] [were] not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Puerner's evidence falls far short of this standard.

Puerner argues that he needed 30-40 mmHg compression stockings because he has deep venous thrombosis. But Puerner concedes in response to several of Atkinson's proposed findings of fact that he has no proof that he ever received a diagnoses of deep venous thrombosis; the VA records do not show that Puerner ever was diagnosed with deep venous thrombosis; and Puerner never had any symptoms of deep venous thrombosis during the time that Atkinson treated him. Plt.'s Resp. to DPFOF, dkt. 89, ¶¶ 43, 67, 71, 86, 88, 90.

---

[5] https://vascular.org/patient-resources/vascular-conditions/chronic-venous-insufficiency.

This means that the *only* evidence Puerner has to support his claim are medical records showing that in 1998 and 1999, VA physicians issued orders for compression stockings that were *either* 20-30mmHg *or* 30-44 mmHg, with the 30-40 mmHg stockings being "preferred." These records are simply not enough to show that Puerner actually needed 30-40 mmHg stockings in 2014, let alone that Atkinson was deliberately indifferent because she chose not to specially order them for him. Instead, the VA orders show that, about 15 years earlier, VA doctors thought that Puerner would benefit from *either* level of compression for his varicose veins and venous insufficiency. These records tell us next to nothing about Puerner's compression needs in 2014; they do not come close to establishing that Atkinson was deliberately indifferent for failing to supply Puerner with higher level compression stockings.

At most, Puerner's evidence shows that *he* wanted higher-level compression stockings and he disagreed with Atkinson's decision not to specially order them for him. But "mere disagreement with a doctor's medical judgment" is not enough to support an Eighth Amendment violation. *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017). This is particularly true where, as here, all of the medical providers to review Puerner's diagnoses, including Atkinson, Dr. Murphy, Dr. Sauvey and the VA doctors, concurred that 20-30 mmHg stockings would be sufficient.

Puerner's evidence is also insufficient to support a negligence claim, as he has no evidence from which a jury could infer that Atkinson breached her duty of care to him or that he suffered injury as a result. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (negligence claim requires proof of (1) a breach of (2) a duty owed (3) causing (4) harm to the plaintiff). Specifically, Puerner has no evidence that wearing 20-30 mmHg compression stockings caused him pain, increased his risk of deep venous thrombosis, or even that they failed

to provide the support he actually needed for his varicose veins and venous insufficiency. Without such evidence, Puerner cannot sustain a negligence claim. Accordingly, I am granting summary judgment to Atkinson on Puerner's Eighth Amendment and state law claims.

One final note: Puerner repeatedly requested that the court recruit counsel for him, arguing that a lawyer would have an easier time gathering evidence and proving his claim. I denied Puerner's requests, however, noting that Puerner's claim was legally and factually straightforward and that Puerner appeared capable of presenting his arguments and evidence on his own. After reviewing the parties' summary judgment submissions, I conclude that a lawyer could not have obtained a more favorable outcome for Puerner on Atkinson's motion for summary judgment. *Atkinson's* attorney obtained and presented to the court the very medical records that Puerner contended would support his claim. But these medical records did *not* support his claim that he needed 30-40 mmHg compression stockings as treatment for deep venous thrombosis. The undisputed material facts demonstrate that Puerner's claims are unsupported.

ORDER

IT IS ORDERED that defendant Dawn Atkinson's motion for summary judgment (dkt. 73) is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 28th day of July, 2017.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge